**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

TRI-COUNTY CONTRACTORS, INC.;
JOHN KENNETH HUNTER,

       *Plaintiffs*,

    v.

THOMAS E. PEREZ, Secretary of Labor,

       *Defendant*.

Civil Action No. 13-1406 (RDM)

---

**MEMORANDUM OPINION AND ORDER**

    This is an action brought under the Administrative Procedure Act ("APA"), 5 U.S.C.

§ 702 *et seq.*, by a minority-owned small business to challenge its debarment from participation

in federal contracting programs.  From 2006 to 2007, plaintiff Tri-County Contractors, Inc., was

a contractor for the Federal Emergency Management Agency ("FEMA") on the Gulf Coast,

where it repaired and inspected trailers used for temporary housing.  During this period, the

Department of Labor conducted two investigations into whether Tri-County was complying with

the McNamara-O'Hara Service Contract Act ("SCA") and the Contract Work Hours and Safety

Standards Act ("CWHSSA"), which collectively set wage standards for federal contractors in

their role as employers.  The Department found statutory violations during both investigations,

and after the second investigation, it filed a formal complaint.  In February 2009, an

Administrative Law Judge ("ALJ") formally recommended that Tri-County be debarred for a

three-year period, and the Department's Administrative Review Board affirmed the ALJ's order

in July 2012.  Tri-County was debarred from July 2012 to July 2015.

Tri-County brought this action under the APA seeking to set aside the debarment order. The matter is before the Court on the parties' cross-motions for summary judgment. *See* Dkts. 9, 12. Because the debarment period ended while this matter was pending, the Court ordered the parties to submit supplemental briefs on whether the matter is moot. Finding that this matter is not moot, because the expired debarment order is likely to impede Tri-County's ability to obtain federal contracts in the future, but that the ALJ did not act arbitrarily and capriciously in ordering Tri-County debarred for willfully failing to record its employees' hours accurately, the Court will grant the Secretary's motion for summary judgment and deny Tri-County's cross-motion for summary judgment.

## I. BACKGROUND

### A.      Statutory Background

Congress enacted the SCA in 1965 in order to "provide wage and safety protection for employees working under Government service contracts." S. Rep. No. 92-1131, at 1 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3534, 3534. The Act requires every service contract with the United States for an amount greater than $2,500 to include certain protections for the contractor's employees. *See* 41 U.S.C. § 6703; 29 C.F.R. § 4.6. Among other things, each such contract must specify "the minimum wage to be paid to each class of service employee." 41 U.S.C. § 6703(1). The contract must also provide for the payment of fringe benefits. *Id.* § 6703(2). And in order to facilitate the proper payment of wages and fringe benefits, the contractor is required to "make and maintain for 3 years . . . records containing," among other information, "[t]he correct work classification or classifications, rate or rates of monetary wages paid and fringe benefits provided, . . . daily and weekly compensation of each employee, [and] [t]he number of daily and weekly hours so worked by each employee." *See* 29 C.F.R. §

4.6(g)(1)(ii)– (iii).  All federal contractors must also comply with the CWHSSA, which requires

them to pay their employees "at a rate not less than one and one-half times the basic rate of pay[]

for all hours worked in excess of 40 in the workweek."  40 U.S.C. § 3702(a).

     The Secretary of Labor is charged with the enforcement of the SCA and the CWHSSA,

*see* 40 U.S.C. § 3703(a); 41 U.S.C. § 6707(a), and is authorized to debar a federal contractor

found to be in violation of either statute—that is, to bar it from receiving federal contracts, *see* 41

U.S.C. § 6706(b); 29 C.F.R. § 5.12.  The SCA goes farther—it *requires* the Secretary to

"forward to the Comptroller General . . . the name of [any] person or firm found to have

violated" the statute and *requires* a mandatory 3-year debarment period for such an entity

"[u]nless the Secretary recommends otherwise because of unusual circumstances."  41 U.S.C.

§ 6706(b).  Congress established such a "severe sanction" due to its concern that "employees of

government-service contractors historically 'tended to be among the lowest paid people in the

economy.'"  *Summitt Investigative Serv., Inc. v. Herman*, 34 F. Supp. 2d 16, 19 (D.D.C. 1998)

(quoting *Hearing on H.R. 6244 and H.R. 6245 Before the H. Comm. on Educ. & Labor*, 92d

Cong. 3 (1971) (statement of Rep. O'Hara)).  Accordingly, the SCA makes the "debarment of

contractors who violate[] the SCA . . . the norm, not the exception."  *Vigilantes, Inc. v. Adm'r of

Wage & Hour Div.*, 968 F.2d 1412, 1418 (1st Cir. 1992).

     The SCA itself does not define the "unusual circumstances" that the Secretary must find

in order to exempt a contractor from debarment, but the Secretary has set forth a three-part test in

the Act's implementing regulations to assess whether such circumstances exist.  *See* 29 C.F.R.

§ 4.188(b)(3).  The first prong of this test forecloses relief from debarment if certain aggravating

factors exist: for example, if the violation of the SCA was "willful" or "deliberate," or if the

contractor "has a history of similar violations."  *Id.* § 4.188(b)(3)(i).  Under the second prong of

the test, relief from debarment is permitted only if certain "prerequisites" are present, including, among others, "cooperation in the investigation" and "repayment of moneys due." *Id.* § 4.188(b)(3)(ii). If the first two prongs of the test are met, the Secretary finally considers "a variety of factors," such as the existence of "recordkeeping violations [that] impeded the investigation" and "the impact of violations on unpaid employees." *Id.*; *see also Summitt*, 34 F. Supp. 2d at 20 (reciting this test); *A to Z Maint. Corp. v. Dole*, 710 F. Supp. 853, 855 (D.D.C. 1989) (describing this test as "a set of narrow, relatively demanding criteria").

**B.     Facts and Proceedings Below**

Tri-County is a corporation headquartered in Jackson, Mississippi. Dkt. 19-7 at 6 (Joint App. 222) ("J.A."). John Kenneth Hunter is its president and CEO. *Id.* In April 2006, Tri-County entered into a contract with FEMA to inspect and repair temporary trailers that housed Gulf Coast residents whose homes had been destroyed by Hurricane Katrina. J.A. 221; *see also* Dkt. 25-2 at 50 (Hr'g Tr. at 379) ("Tr."). Under the terms of that contract, Tri-County was obligated to follow the SCA and the CWHSSA, and it was therefore required to pay employees a minimum wage rate. J.A. 62, 221; *see also* J.A. 324–30 (SCA terms as incorporated into the contract). The contract provided a list of occupations and minimum wage rates, *see* J.A. 377–82, but did not specifically provide wage rates for "preventative maintenance inspectors," the trailer inspectors whose wages are at the heart of this action.

Tri-County initially paid its inspectors a "piece rate" of $6.50 for every trailer inspected. Tr. 56, 115, 158. (The "piece rate" was subsequently increased to $7. *See id.*) According to the employees who testified at Tri-County's debarment hearing, the use of a piece rate was common in the developing market for FEMA trailer inspections. Tr. 40, 72. But Tri-County's rate was lower than the rate of $10 per trailer that many employees had previously been paid by another

company, Tr. 72, 158, and eventually one of Tri-County's employees, Teresa Dabbs, reached out to the Department of Labor to complain that she was not being paid an adequate wage, Tr. 25. The Department began an investigation into Tri-County's labor practices in December 2006.  Tr. 283.

The scope and emphasis of the Department's first investigation are disputed by the parties.  But it is clear that the Department made at least three findings at the end of this investigation.  First, the Department found that Tri-County had failed to keep records of the actual hours that its "piece rate" employees were working.  J.A. 223; Tr. 287.  Second, it found that Tri-County had failed to pay its employees the fringe benefits required by law.  Tr. 290–91. Finally, it found that—based on the hours it estimated Tri-County's "piece rate" employees had worked—Tri-County had failed to pay those employees the equivalent of the minimum hourly wage required under its contract and had failed to pay them time-and-a-half for all hours worked over 40.  J.A. 223; Tr. 287–90.  Because the contract had not listed a specific wage rate for the inspector position, the Department relied on a generic equivalent—"Laborer"—to calculate the minimum hourly wage that it believed was required ($10.21).  *See* Tr. 310–12 ("[W]hen [we] don't have a classification listed, we use the closest one . . . to match the type of work that was being performed.") (testimony of Ms. Van Etten); Tr. 319–20 (explaining that there was no problem with using the $10.21 rate, because it was listed in the contract and it "closely matched the type of work being performed") (same).  The Department ordered Tri-County to pay $52,994.42 in unpaid wages and benefits to its employees, but did not seek debarment.  J.A. 223; Tr. 298.

What happened after the Department's first investigation is the subject of even greater dispute.  Hunter testified that Tri-County made a concerted effort to come into compliance.  Tr.

146.  He testified that he required his employees to record the actual hours that they worked in any given week.  Tr. 171.  He testified that he directed them not to work more than 40 hours per week unless instructed.  *Id.*  And he testified that Tri-County began to pay its inspectors using a formula that the Department's investigator, Melissa Van Etten, had approved during a meeting after the investigation had ended.  Tr. 168.  Using this formula, he explained, the inspectors recorded the number of trailers that they had inspected each day; if they had inspected more trailers than the "average" number calculated by Van Etten during the first investigation, they would receive an additional check at a "supplemental rate."  Tr. 167–69.  Hunter testified that he had attempted to contact Van Etten in the weeks and months after the first investigation in order to ensure that Tri-County's new method of paying inspectors was compliant with the SCA, but that Van Etten had not responded.  Tr. 146.

The Tri-County employees who later testified at the debarment hearing told a different story.  According to the employees, although Tri-County instructed them to sign a document stating that they would work only 40 hours each week, they in fact regularly worked between 50 and 60 hours each week, including weekends, in order to accomplish their assigned inspections. Tr. 22–27, 60–64, 84–85, 96–97, 116–22.  The inspectors testified that they were asked to record the number of trailers that they had inspected, not the number of hours they worked; that occasionally they were asked to sign timesheets that Tri-County had filled out recording the number of hours worked in any given week as 40; but that in fact they were working more than 40 hours each week without receiving overtime pay.  *See, e.g.*, Tr. 61–62 ("Q.  Did the time sheets show a number of hours worked in your average week?  A.  Yes, sir.  Q.  And what was the number it usually showed?  A.  Forty hours.  Q.  Did you work 40 hours a week?  A.  No, sir.").

In August 2007, the Department began a second investigation into Tri-County's labor practices. This investigation focused on the company's failure to keep accurate records of the hours worked by its inspectors, and the related failure to pay overtime and prevailing wages. Tr. 299–301.[1] At the end of the investigation, Van Etten recommended debarment "due to the willful and repeated violations" of the SCA and CWHSSA. Tr. 303. The Department ordered Tri-County to pay $49,015.39 in back wages and overtime, J.A. 224, and in September 2008 it filed a formal complaint seeking Tri-County's debarment, J.A. 230. The parties appeared for a formal hearing before the ALJ in April 2010, and the ALJ ordered Tri-County debarred under the SCA for a period of three years in October 2010. J.A. 221, 228. The ALJ found, among other things, that Tri-County "had been instructed to record actual hours worked, had agreed to do so, and did not do so." J.A. 225. Instead, the ALJ found, Tri-County's timesheets "never showed more than forty hours worked per week, no matter how many hours each employee actually worked." J.A. 224. On the basis of these findings, as well as others, the ALJ concluded that Tri-County could not demonstrate the "unusual circumstances" required to excuse debarment, because its violations were "the result of willful and deliberate action." J.A. 226–227. Although the ALJ was not required to proceed to the second and third prongs of the "unusual circumstances" test, he explained that Tri-County would have failed those prongs as well. J.A. 228.

Tri-County filed a timely petition for review with the Administrative Review Board ("ARB"). J.A. 249. On June 29, 2012, the ARB entered a decision and order affirming the ALJ.

---

[1] In June 2007, the Labor Department formally amended the wage tables associated with Tri-County's contract to specify an hourly rate of $13.96 for "preventative maintenance inspectors." J.A. 445. The wage and overtime violations found during the second investigation were based on this figure. Tr. 343.

J.A. 61.  The ARB concluded that "the overwhelming evidence supports the ALJ's conclusion that the repetitive nature of Tri-County's violations 'can be seen as culpable conduct requiring debarment under the Act.'"  J.A. 64 (quoting J.A. 227).  Accordingly, it directed the Secretary of Labor to initiate debarment proceedings, and Tri-County became ineligible to receive federal contracts for three years on July 18, 2012.  Dkt. 1 at 8 (Compl. ¶ 23).  Over a year later, Tri-County filed this action to challenge its debarment.  Dkt. 1.  The parties filed cross-motions for summary judgment, which were fully briefed by May 30, 2014, Dkt. 16, and they filed the joint appendix on November 5, 2014, Dkt. 17.  Tri-County's debarment period ended on July 17, 2015.  Dkt. 1 at 8 (Compl. ¶ 23).  Subsequently, the Court held a status conference and ordered the parties to submit supplemental briefs regarding mootness.  The parties did so, Dkts. 22, 26, and Plaintiff filed a further declaration on February 12, 2016, addressing additional questions posed by the Court, Dkt. 27.  The motions for summary judgment, including the mootness issue, are now fully briefed.

## II.  STANDARD OF REVIEW

Tri-County's suit arises under Section 706(2)(A) of the APA, which precludes agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This provision directs a reviewing court to set aside agency action that is not the product of "reasoned decisionmaking."  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).  This standard of review is a "deferential" one.  *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 233 (D.C. Cir. 2008); an agency action will be set aside only if the agency has "failed to consider relevant factors or made a manifest error in judgment," *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 300 (D.C. Cir. 2003).  That means that courts will generally find an agency action "arbitrary and capricious" only "if the agency . . .

relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency[] or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

A court reviewing agency action under the APA will generally defer to findings of fact if they are supported by "substantial evidence." 5 U.S.C. § 706(2)(E). Here, however, because the proceedings below were governed by the procedural provisions set out in Title 41, *see* 41 U.S.C. §§ 6506–07, the Department argues that the standard of review set out in that title, rather than the standard of review set out in the APA, applies. Under that title, the Secretary of Labor or his representative may "hold hearings" upon a complaint that a federal contractor has violated the law or the governing contract, and, "[a]fter notice and a hearing, . . . shall make findings of fact." 41 U.S.C. § 6507(b), (e). "The findings are conclusive for agencies of the United States," and "[i]f supported by a preponderance of the evidence, . . . are conclusive in any court of the United States." *Id.* § 6507(e). As a result, every court to have considered the question has concluded that the Act displaces the APA's ordinary standard of review for findings of fact and establishes its own standard of review for such findings.

As courts in several jurisdictions have noted, however, the Act leaves ambiguous exactly what that standard of review is. As the First Circuit has explained:

> In its normal iteration, the preponderance of the evidence standard, like "clear and convincing" and "beyond a reasonable doubt," establishes a quantum of proof to be measured by the factfinder, not a standard for error-detection. When used to describe appellate review, however, the phrase is at best an awkward locution, for it connotes nothing about the degree of probability of error required before a reviewing court may set aside a factual determination.

*Dantran, Inc. v. U.S. Dep't of Labor*, 171 F.3d 58, 70 (1st Cir. 1999). Accordingly, courts are divided on how to construe § 6507(e)'s standard of review. The First Circuit interprets it to

require courts to review the Department's findings of fact for clear error, *id.* at 71; *see* Fed. R. Civ. P. 52(a)(6), a standard of review "somewhat stricter (*i.e.*, allowing somewhat closer judicial review) than the APA's," *Dickinson v. Zurko*, 527 U.S. 150, 153 (1999).  The First Circuit's conclusion stems from an analogy to the Multimember Pension Plan Amendments Act of 1980, which sets up a "presumption, rebuttable only *by a clear preponderance of the evidence*, that the findings of fact made by the arbitrator were correct."  29 U.S.C. § 1401(c) (emphasis added); *see Dantran*, 171 F.3d at 70.  Because most circuits have interpreted that statute to require clear error review, and because both statutes refer to a "preponderance of the evidence," the First Circuit reasoned that Congress intended reviewing courts to employ the familiar clear-error standard when reviewing the factual findings made by the Department in debarment proceedings as well. *Dantran*, 171 F.3d at 70–71.

Several district courts in other jurisdictions, by contrast—as well as the dissenting judge in *Dantran*—have interpreted § 6507(e) to require a form of *de novo* review.  *See, e.g.*, *Dantran*, 171 F.3d at 77 (Cudahy, J., concurring in part and dissenting in part); *Karawia v. U.S. Dep't of Labor*, 627 F. Supp. 2d 137, 143–45 (S.D.N.Y. 2009); *cf. J.N. Moser Trucking, Inc. v. U.S. Dep't of Labor*, 306 F. Supp. 2d 774, 783–84 (N.D. Ill. 2004).  As Judge Cudahy explained, "If the finder of fact and the reviewing authority are bound by the same standard in establishing the facts (preponderance of the evidence), the logic of the situation is that review is essentially *de novo*."  *Dantran*, 171 F.3d at 77 (Cudahy, J., concurring in part and dissenting in part).  Several of these district courts have also opined that a better analogy is to the Individuals with Disabilities Education Act ("IDEA"), which permits a district court to review an administrative record, "hear additional evidence," and "bas[e] its decision on the preponderance of the evidence," 20 U.S.C. § 1415(i)(2), and which many Courts of Appeals (including this Circuit's)

have held sets a significantly less deferential standard of review.  *See Karawia*, 627 F. Supp. 2d at 143; *J.N. Moser*, 306 F. Supp. 2d at 784; *see also Reid ex rel. Reid v. D.C.*, 401 F.3d 516, 522 (D.C. Cir. 2005) (describing IDEA's "non-deferential standard").  The D.C. Circuit has not resolved the standard of review that applies to findings of fact made pursuant to Title 41.  *See Federal Food Serv., Inc. v. Donovan*, 658 F.2d 830, 833 (D.C. Cir. 1981) (simply noting that "the Secretary's findings of fact must be supported by a preponderance of the evidence.").

Although the Court finds Judge Cudahy's understanding of the standard of review more persuasive than the *Dantran* majority's, it need not definitively resolve the question.  Under either standard of review, the Court would not overturn the findings of fact made by the ALJ and upheld by the ARB because, as explained below, those findings of fact are amply supported by the record.  Accordingly, the Court will assume that it reviews the Department's findings of fact "essentially *de novo*" in order "to determine whether a preponderance of the evidence supports" the agency's factual findings.  *See Dantran*, 171 F.3d at 77 (Cudahy, J., concurring in part and dissenting in part) (quoting *Vigilantes*, 968 F.2d at 1418).  If the Court concludes that those factual findings are well supported, it must then review the Department's exercise of its discretion, if any, and its conclusions of law under the APA to determine whether its decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## III.  DISCUSSION

### A.   Mootness

The Court must first consider whether the case is moot in light of the fact that Tri-County is no longer barred from participating in federal contracting programs.  "[S]ubject matter jurisdiction 'is, of necessity, the first issue for an Article III court,' for '[t]he federal courts are

courts of limited jurisdiction, and they lack the power to presume the existence of jurisdiction in order to dispose of any case on any other ground.'" *See Loughlin v. United States*, 393 F.3d 155, 170 (D.C. Cir. 2004) (quoting *Tuck v. Pan American Health Org.*, 668 F.2d 547, 549 (D.C. Cir. 1981)).  "Even where litigation poses a live controversy when filed, the doctrine requires a federal court to refrain from deciding it 'if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'" *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc) (quoting *Transwestern Pipeline Co. v. FERC*, 897 F.2d 570, 575(D.C. Cir. 1990)).  Here, the question is whether the case is moot because the three-year debarment period that began in July 2012, when the ARB entered its order affirming the ALJ's determination that Tri-County should be debarred, ended in July 2015.

Tri-County's central argument is that although it is no longer barred from participating in federal contracting programs, its 2012 debarment remains on its record and is likely to impede it from obtaining federal contracts.  As a general matter, an "injury to reputation can constitute a cognizable injury sufficient for Article III standing." *Foretich v. United States*, 351 F.3d 1198, 1211 (D.C. Cir. 2003); *see also McBryde v. Comm. to Review Circuit Council Conduct*, 264 F.3d 52, 57 (D.C. Cir. 2001).  But because "claims of reputational injury" are at times "too vague and unsubstantiated to preserve a case from mootness," the Court must ask whether "some tangible, concrete effect" of a challenged action remains in order to preserve a controversy.  *McBryde*, 264 F.3d at 57–58 (quoting *Penthouse Int'l Ltd. v. Meese*, 939 F.2d 1011, 1019 (D.C. Cir. 1991)).

The D.C. Circuit has repeatedly held that the "concrete effect" that an expired debarment order has on a government contractor's reputation can satisfy that requirement. *See, e.g.*, *Kisser v. Cisneros*, 14 F.3d 615, 618 n.4 (D.C. Cir. 1994); *Reeve Aleutian Airways, Inc. v. United*

*States*, 889 F.2d 1139, 1143 (D.C. Cir. 1989); *Caiola v. Carroll*, 851 F.2d 395, 401 (D.C. Cir. 1988). In *Reeve*, for instance, an administrative board established by the Department of Defense ("DOD") suspended an air carrier from participating in a DOD airlift program. *See* 889 F.3d at 1141. The carrier filed suit to challenge the suspension, but DOD lifted the suspension while the suit was pending. *Id.* On appeal, DOD argued that the suit was moot, but the D.C. Circuit held that it was not. *Id.* at 1142–43. It explained that the carrier "has demonstrated the negative effects of the suspension on its public and civilian traffic, and it claims that it is still 'under a cloud of suspicion for its suspension, evidenced by the significant and continuing drops in traffic after the [administrative] decision.'" *Id.* at 1143 (quoting a brief). Other cases are to similar effect. *See Kisser*, 14 F.3d at 618 n.4 (explaining that the case was not moot because the sanction "will continue adversely to affect [the contractor] in future transactions with HUD"); *Caiola*, 851 F.2d at 401 ("[T]he prospect of a lingering stigma or other adverse impact appears to keep this case vital.").

The Department argues that these cases are distinguishable on two related grounds. First, the Department asserts that several of these cases turned on the existence of regulations that required contracting officers to consider past debarments in awarding contracts—and no such regulations exist in this case. Second, the government maintains, even in the absence of such a regulation, it is the plaintiff's burden to substantiate its assertions that the challenged debarment will impact its ability to obtain future contracts. *See O'Gilvie v. Corp. for Nat'l Cmty. Serv.*, 802 F. Supp. 2d 77, 82–83 (D.D.C. 2011) (finding a challenge to expired debarment moot on substantially these grounds). The Court agrees that this is a close case, but concludes that it is not moot.

First, although the D.C. Circuit has on several occasions cited regulations that required contracting officers to consider a contractor's debarment record as evidence that a reputational harm was sufficiently "concrete," it has never treated such regulations as an essential condition for a finding that a case is not moot.  In *Reeve*, for example, the D.C. Circuit said nothing about whether any DOD regulations would require future consideration of the aircraft carrier's record of past suspensions; it observed only that the contractor was "still 'under a cloud of suspicion'" as a result of the expired suspension.  889 F.2d at 1143.  In any event, the relevant regulations here permit—even if they do not require—a contracting officer to consider a contractor's debarment record.  The Federal Acquisition Regulations ("FAR"), which govern the lion's share of federal contracting (and which both parties agree would apply to future contracts obtained by Tri-County), require a contracting officer to "obtain information regarding the responsibility of prospective contractors."  48 C.F.R. § 9.105–1(b)(1).  And while the regulations caution that an expired debarment "may not be relevant to a determination of present responsibility," *see id.* § 9.104–6(b), they also require contracting officers to consider "past performance information" in making their determinations, *id.*; *see also id.* §§ 9.104–3(b), 9.105–1(c), 42.1501 (to similar effect).  As the government acknowledges, *see* Dkt. 26-2, information regarding Tri-County's debarment record is readily available online.  This is thus not a case like *O'Gilvie*, in which the relevant regulation (not part of the FAR) "d[id] not call for an evaluation of contractor responsibility" at all.  802 F. Supp. 2d at 83; *cf. Hickey v. Chadick*, 649 F. Supp. 2d 770, 774–75 (S.D. Oh. 2009) (relying on the FAR provisions that would apply here to find a case not moot).

Second, Tri-County has demonstrated both that it intends to continue to operate government contracting businesses and that the existence of a past debarment order poses an ongoing impediment to its ability to do so.  Hunter, Tri-County's CEO, attests that, shortly after

14

his debarment ended in 2015, he "competed for and was awarded a federally-funded contract . . . under the name of a new company." Dkt. 27 at 1 (Supp. Hunter Decl. ¶ 4).  He explains that he did not bid for this contract as Tri-County Contractors because he was worried about the stigma of the debarment order, but that he "would like to bid for new work" as Tri-County so he does not "lose the benefit of name recognition and successful past performance." *Id.* at 2 (Supp. Hunter Decl. ¶ 5).  Hunter attests that, if the debarment order is vacated, he would compete as Tri-County "for an upcoming Blanket Purchase Agreement that will be issued by FEMA for maintenance and deactivation services . . . in support of temporary housing units" in disaster areas in Mississippi. *Id.* (Supp. Hunter Decl. ¶ 7).  This provides a sufficient basis to conclude that the lingering consequences of the debarment order will likely impact Tri-County's ability to compete for and to obtain federal contracts, especially in light of the FAR regulations that permit contracting officers to consider contractors' past performance.

Accordingly, the Court concludes that the prospect that Tri-County's expired debarment will impede it from obtaining federal contracts in the future is sufficiently "concrete" to preserve this case as a live controversy.  Because the case is not moot, the Court will proceed to its merits.

**B.     Debarment**

The ALJ concluded, and the ARB agreed, that Tri-County could not demonstrate the "unusual circumstances" required to excuse debarment because its statutory violations were "the result of willful and deliberate action."  J.A. 227.  The ALJ wrote:

> At the conclusion of the first investigation, Mr. Hunter was clearly informed of his obligations to keep accurate hourly records and pay the agreed-upon hourly rate.  However, he instead chose to generate inaccurate timesheets through the use of a computer program.  The statements and testimonies of Respondents['] former employees establishes that these timesheets did not accurately reflect the hours worked by each employee and were instead based on the number of trailers each employee had inspected.

*Id.* As a result, he explained, Tri-County could not satisfy the first prong of the Department's test for "unusual circumstances," which forecloses relief from debarment if the statutory violations were "willful, deliberate, aggravated in nature, or the result of culpable conduct," or if the contractor has "a history of similar culpable conduct." *Id.*; *see* 29 C.F.R. § 4.188(b)(3).

The ALJ's conclusion was plainly reasonable. A contractor governed by the SCA and CWHSSA is required to "make and maintain for 3 years . . . records containing," among other information, "[t]he number of daily and weekly hours . . .worked by each employee." 29 C.F.R. § 4.6(g)(1)(iii). This is not merely a ministerial requirement. Under most labor laws, it is the burden of the complainant to "prov[e] that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). But because the employer, not the employee, "is in position to know and to produce the most probative facts concerning the nature and amount of work performed," the SCA, like most labor laws, charges the employer with "keep[ing] proper records of wages, hours and other conditions and practices of employment." *Id.* An employer that fails to keep such records seriously impedes efforts by employees—or, here, by the Secretary—to hold the employer accountable for violating federal labor laws. Thus, an agency acts reasonably in concluding that a contractor that has been told to keep accurate records, but has failed to do so, has willfully and deliberately violated one of the SCA's cornerstone provisions.

The factual record, even reviewed *de novo*, also amply supports the ALJ's conclusion that Tri-County had been admonished to comply with the relevant recordkeeping requirements. Van Etten, the Labor Department investigator, testified that she told Hunter at the end of the initial investigation that Tri-County was "required to keep records of actual hours worked for all employees, including piece rate employees." Tr. 292. Hunter gave the same testimony. *See* Tr.

163–64 ("Q.  And did [Van Etten] tell you that, as part of her Wage and Hour investigation, you would have to keep an accurate record of actual hours worked?  A.  Yes.").  Tri-County makes a number of arguments as to why the ALJ's debarment order should be set aside, which the Court addresses below.  But it does not contest that it was told at the end of the first investigation that it would need to keep accurate records of the number of hours its employees actually worked—not just the number of trailers they inspected.

It is just as clear from the record that, in spite of this admonition, Tri-County failed to maintain the required records.  Each of the employees who testified at the hearing stated that she was never told to record her actual hours worked.  Tr. 23–24, 61–63, 93–97, 115–17.  Instead, the employees explained, they were occasionally brought into Tri-County's offices and told to sign time sheets that stated they had worked 40 hours that week.  *Id.*  And the employees testified that they in fact worked many more hours than that.  Inspector Linda James kept her own time sheets that accurately documented the number of hours she worked.  Tr. 87–90.  The Department introduced those records into evidence at the hearing.  James's personal records showed, for instance, that she had worked 60.75 hours during the week of June 21, 2007.  Tr. 94.  Tri-County's records, in contrast, showed that she had worked exactly 40.  *Id.*  Inspector Donna Carter was asked at the hearing whether she had ever "check[ed] the number of hours on the time sheet[s]" she was told to initial.  Tr. 116.  She said: "No, because we knew that it was going to be 40."  *Id.*  There is no ambiguity in the record.  In spite of Van Etten's admonition, Tri-County failed to keep accurate records of the number of hours its employees worked.

Tri-County's primary objection to this conclusion is that any failure accurately to record its employees' hours was, at most, the result of negligence rather than culpable conduct.  But the reasons that Tri-County offers in support of this argument fall flat.  First, Tri-County argues that

it understood Van Etten's instructions to require—or at least to allow—it to use a "formula" that would estimate employees' hours.  Sabrina Fountain, who supervised the inspectors for Tri-County, testified that the inspectors would enter the number of trailers they inspected into a spreadsheet, which would then calculate the number of hours they purportedly worked.  *See* Tr. 214–23, 228–33.  Fountain said that the employees were responsible for verifying that number. Tr. 229 ("A.  They are basically agreeing.  Q.  They are agreeing with the computer?  A. Right.").

Tri-County's argument suffers from several flaws.  First, no employee testified that she was ever asked to verify her actual hours worked on a spreadsheet.  Second, even if Tri-County used such a spreadsheet to *approximate* employees' hours, as it claims, that would not relieve it of its obligation to keep records of *actual* hours worked.  *See* 29 C.F.R. § 4.6(g)(1)(iii).  And the record is clear that Tri-County made no real effort to do so.  For one, even accepting its contention that it intended its inspectors to use the approximations as a starting point—to be revised upward if the inspectors worked more hours than were shown on the spreadsheets—it is implausible that any properly written formula would uniformly produce figures of exactly 40 hours per week.  *See* Tr. 229 ("Q.  Now, there are many time sheets that are in evidence where it says 40 hours for the employee, and the number of work orders could range from 75 to 125.  A. Uh-huh.  Q.  But it still takes the same 40 hours, you're saying?  A.  Uh-huh.").  Nor is it plausible that—had the inspectors been properly instructed to verify their hours worked—they would have uniformly verified that they worked exactly 40 hours per week.  It is possible that *some* inspectors, in *some* weeks, spent exactly 40 hours inspecting trailers.  But the evidence casts grave doubt on Tri-County's claim that it worked in good faith to establish a reporting

system that would permit it (or the Secretary) to determine with any degree of accuracy how many hours its employees were actually working.

Nor is it plausible that Van Etten misled Tri-County into employing such a system. Van Etten testified that she never discussed such a reporting system with Tri-County, Tr. 293; that such a system would cause recordkeeping violations, Tr. 293–94; and that she had never, in 21 years of employment at the Labor Department, authorized an employer to use a spreadsheet that would approximate actual hours worked, Tr. 296. In contrast, the record contains no credible evidence that supports Tri-County's claim that it reasonably believed it was complying with the Act by generating its employees' timesheets for them.

Second, and similarly, Tri-County attempts to shift responsibility for its failure to keep accurate records to the Department, or, alternatively, to its employees. Tri-County argues that it repeatedly attempted to contact Van Etten to confirm that its computer-generated recordkeeping system was compliant with the Act. It also claims that, to the extent the inspectors worked over 40 hours each week without recording their hours, they did so in contravention of Tri-County's instructions not to do so. But even to the extent these arguments find support in the record (and the second does not, *see* Tr. 27, 84), they are beside the point. The regulations are clear that it is the *employer's* responsibility to keep accurate records, 29 C.F.R. § 4.6(g)(1)(iii); it cannot escape liability "by attempting to shift [its] responsibility to subordinate employees," *id.* § 4.188(b)(5). *Cf. Caserta v. Home Lines Agency, Inc.*, 273 F.2d 943, 946 (2d Cir. 1959) (Friendly, J.) ("The obligation is the employer's and it is absolute. He cannot discharge it by attempting to transfer his statutory burdens of accurate record keeping . . . and of appropriate payment, to the employee."). And to the extent that Tri-County was left with any good-faith confusion about the meaning of Van Etten's exit instructions after the first inspection, it cannot have been confused

about its obligation to keep records of *actual* hours worked, given the undisputed testimony of both Van Etten and Hunter that such an instruction was provided. *See* Tr. 163–64, 292.

Tri-County raises a number of additional arguments about errors made by the Department or the ALJ. It argues at length that the Department erred in concluding that it had failed to pay its employees prevailing wages or overtime. It claims that the Department's assessments of unpaid wages were based on rates that were calculated on an *ad hoc* basis near the end of each investigation and that Tri-County had no notice of those purported rates before the investigations began. *See* Dkt. 11-1 at 11, 21–22. It argues that the Department calculated the unpaid wages and fringe benefits on the basis of implausibly low estimates of the number of trailers each inspector could visit in an hour, leading to overblown assessments. *Id.* at 6. And it argues that it *did* provide its employees with fringe benefits, or the equivalent thereof—it simply failed to separately document those benefits on its employees' pay stubs and in its records. *Id.* at 19–20.

But Tri-County's arguments are misdirected. The primary basis of the ALJ's debarment order was not Tri-County's failure to pay prevailing wage rates and fringe benefits, but its willful failure to accurately record its employees' hours. *See* J.A. 227. As the Court described above, that factual finding is amply supported by the record. That finding, moreover, standing alone, provided the ALJ with a sufficient basis for a debarment determination. Indeed, without the records that Tri-County was required (and had been admonished) to keep, neither the Secretary nor the Court is in a position to even assess Tri-County's contention that it paid its employees the required amount. And to the extent that Tri-County argues that the Department's calculations were based on erroneous estimates of the hours its employees actually worked, such estimations, too, are the necessary result of Tri-County's own failure to keep accurate records of its employees' hours.

Tri-County's contention that there was no "prevailing wage" rate to pay, moreover, *see* Dkt. 11-1 at 5, misstates the record.  Van Etten testified before the ALJ that in the course of the first investigation, she concluded that the "appropriate prevailing wage rate" for the Tri-County inspectors was $10.21 per hour, which was the contractual rate for a "laborer" specified in the tables that had been attached to Tri-County's contract.  Tr. 285; J.A. 380.  Such a determination is entirely consistent with the governing regulations, which require contractors to "classify" any "class of service employee . . . not listed" in the wage tables attached to their contracts "so as to provide a reasonable relationship (i.e., appropriate level of skill comparison) between such unlisted" roles and those roles "listed in the wage determination," *see* 29 C.F.R. § 4.6(b)(2)(i), and which authorize the Secretary to make such a classification upon discovery of a contractor's "failure to comply with" this requirement, *id.* § 4.6(b)(2)(vi).  Tri-County protests that the regulations provide for a formal process by which employees' wages are "conformed" to the wage tables, and that it is not clear from the regulations what a contractor is to do in the absence of such a formal classification.  But the regulations *are* clear that the process "shall be initiated by the contractor," *id.* § 4.6(b)(2)(ii), and that if the contractor fails to do so, the Department may issue a classification that will "be retroactive to the date such class of employees commenced contract work," *id.* § 4.6(b)(2)(vi).  That is exactly what Van Etten did here, as she testified:  She found "the closest" classification in the contract that "match[ed] the type of work that was being performed," *see* Tr. 310–12, and concluded that Tri-County had not paid its employees enough to match it.  Although the ALJ's decision to debar Tri-County was not primarily based on its failure to pay its employees a prevailing wage rate, the company's argument that there was no prevailing rate finds little support in the record.

For these reasons, the Court has no difficulty concluding that the ALJ and ARB properly concluded that Tri-County's "willful" and "deliberate" conduct rendered it ineligible for relief from debarment under the first part of the regulatory test. *See* 29 C.F.R. § 4.188(b)(3)(i).  For similar reasons, it is also clear that the ALJ and ARB's conclusions regarding the second and third prongs of the test were supported by the record.  The ALJ concluded that the company failed to clear the second prong, which requires a "good compliance history, cooperation in the investigation, repayment of moneys due, and sufficient assurances of future compliance."  J.A. 228.  In particular, the ALJ found—and the ARB agreed—that Tri-County impeded the investigation by failing to maintain accurate records and "by denying for several months that employees' hours had been computer-generated when this was in fact the case."  *Id.*  Based on its independent review of the record, the Court agrees that these findings are well founded.  *See, e.g.*, Tr. 300–303.  The ALJ and ARB also concluded that even if Tri-Country had met its burden on the first two parts of the "unusual circumstances" test, it failed to satisfy the third requirement, which requires the reviewing official to consider a "variety of factors," including "whether the contractor has previously been investigated for violations of the Act, whether the contractor has committed recordkeeping violations which impeded the investigation, whether liability was dependent upon resolution of a bona fide legal issue of doubtful certainty, the contractor's efforts to ensure compliance," and more.  29 C.F.R. § 4.188(b)(3)(ii).  To the extent that this conclusion was premised on Tri-Country's recordkeeping violations, unsupported denials, and the serious nature of the company's violations, J.A. 228, the Court again agrees that the ALJ's and ARB's conclusions were supported by the evidence.

In short, even reviewed *de novo*, the record supports the ALJ's factual findings.  In turn, the ALJ's determination that Tri-County failed to carry its burden with respect to any of three

parts of the "unusual circumstances" test, *see* 29 C.F.R. § 4.188(b)(3), was neither arbitrary and capricious nor contrary to law; indeed, it was eminently reasonable.  Accordingly, the Court concludes that the Secretary's decision was well-grounded in both fact and law, and that he acted well within his discretion in barring Tri-Country from federal contracting for three years.

## CONCLUSION

For these reasons, the Court **GRANTS** the Department's motion for summary judgment and **DENIES** Tri-County's motion for summary judgment.

**SO ORDERED.**  The Clerk will enter judgment.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  February 23, 2016